Case number 23-3853, Eric Noble versus Cincinnati and Hamilton County Public Library et al. Oral argument, 15 minutes per side. Mr. Okishi for the appellant. Good morning. Good morning, Your Honors. Matthew Okishi on behalf of Mr. Noble, and may it please the court. It is without question that the 2020 protests in the wake of George Floyd were a topic of national debate. Many, if not most, institutions and individuals had an opinion about these protests and the events that preceded them. My client, Eric Noble, had an opinion on these protests. He expressed them on Facebook. Some of his co-workers had opinions. They expressed them on the streets and elsewhere. And his employer, the public library, also had an opinion on these protests, which it expressed on Facebook and in an open letter on its website. Of these three groups, only Mr. Noble suffered any sort of retaliatory action for his speech. It's not disputed that he was fired because of his speech. And it's not disputed that when he spoke, he spoke as a private citizen. The only issue for review, then, is whether Mr. Noble's speech was protected by the First Amendment. And to be so protected, his speech, a meme announcing that no one cares about your protest, must be found to be a matter of public concern. And his speech interest must outweigh the government's efficiency interest as an employer. Your Honors, both prongs are satisfied here. Counsel, I want to just ask you as a predicate. On the Pickering analysis, is that entirely legal analysis to be done by the court? Or is any of that, are you contending any of that needed to go to the jury for any fact finding? I believe court precedent is that it's a matter of law. The only reason I ask is I notice in the Bennett case, we didn't really seem to address our court as to whether the district court had done this properly or not. But there were interrogatories submitted to the jury in the Bennett case on the Pickering analysis. Was that just not proper? I don't think to be done. No, Your Honor. I don't think it wasn't proper for the district court in Bennett to submit it as a jury question. Pickering, I think, has been called a Solomonic weighing. And some judges may find that the jury is in a better position to make that weighting of interest than the court is. I guess, are you arguing for that here? No, Your Honor. It's all something we can decide as a matter of law. What do you want? Oh, Your Honor, we had dueling motions for summary judgment here. I think as a matter of law, Mr. Noble's speech was absolutely protected under the First Amendment. And I would like this court to make a finding of the same under Pickering. In other words, you don't think it should go to a jury. You think we can decide this as a matter of law. Correct, Your Honor. I think the court could set it as a matter of law, because, um, Well, what do we do with the point that in these prior cases, much as the judges are struggling with Pickering balancing, I think, properly, what ends up tending to happen is there tends to be some deference to the employer, as long as they're able to identify a reasonable interest. Isn't that a problem? I mean, I'm not saying I'm comfortable with those prior decisions. But that does seem to be what happened. It may be a problem in those cases, Your Honor. I don't think it's a problem in this case. Because what underpins Is your point just going to be your client's speech wasn't quite as bad? No, no, Your Honor. What underpins the employer's interests in all of these cases is the government's interest, inherent interest, in appearing impartial, appearing balanced and not taking a perspective on political issues or social issues. That was certainly a factor. The bear on its mission, right? The bear on its mission. Correct, Your Honor. OK. Why wouldn't that be an issue here for a public library? Because the public library's only mission is to distribute books within the community. How about safely distribute books in downtown Cincinnati? I suppose safety is a secondary concern of distributing those books. It's implied. But Mr. Noble's speech does not implicate the library's ability to safely distribute books. In fact, it really wasn't distributing books at the time that the speech was made. Well, why couldn't the library infer from the fact that he had a meme of a vehicle running over people to create a safety concern? Because the meme does not pass muster of what anyone would consider to be a true threat, Your Honor. Within the facts of this case, the matter was reported from one employee. You used the phrase true threat. Correct. I don't remember seeing that in our prior cases, and I don't think they saw it the same. I don't think they thought those were true threats. I think they thought it was going to be terrible for morale and a terrible look for a public-facing mission. The prior cases, both Bennett and Marquardt, involved EMS and first responders, Your Honor. There's a, I think, and both courts expressed, there's a significant public interest and a government interest in making sure that those services are being provided without even a scintilla of bias or racism. This case doesn't implicate that. Mr. Noble was a security guard for the public library. At the time, the library was not distributing books. It was closed due to the pandemic. And the only people that are really addressed in this book are protesters. I mean, if we take Mr. Noble's speech at the people that it's directed at, they're not allowed by the library rules to be protesting on the property. They're not allowed to be in there protesting and distributing literature either. Mr. Noble might have had a negative view of these protesters, but the idea that it's going to stem into anything bigger than his mere hyperbole, I think, is rather misplaced, Your Honors. Tell me what to do with, you know, you're running the library and you're thinking to yourself, OK, we've got these protests. A lot of the protesters are our clients. They use this library, whether they're using it immediately or in the future. I'm hypothesizing I'm head of the library, and I say to myself, this is a problem. These are, our mission is to serve these people, and I now have an employee. It's unfortunate how it became public, but who said something that, you know, it's not just lack of courtesy. It seems pretty hateful towards the protesters, who could quite conceivably be people using this service. Yes, Your Honor, but also lots of people who use the public library were not at those protests. Lots of people may not have supported those protests, and some may have even agreed with Mr. Noble's speech. The post itself did not go viral. It was up for a mere 24 hours. The concern that this, unlike in Bennett and Marquardt, it did not become a gigantic sensation. The only people that saw it were somewhere between 50 and 100 of Mr. Noble's Facebook friends and a few employees of the public library. That's it. And the option that was presented, the opportunity that was presented to the library was to conduct a meaningful investigation, which is what Ms. Harden, one of the defendants, said that she was going to do. She wanted to conduct this meaningful investigation. What did the meaningful investigation reveal? Mere disharmony. Coworkers didn't like the speech, but none of them said they felt threatened by it. None of them said they couldn't work with him anymore. They said it may change the way that they viewed him, but that's the way that anybody, that can happen to anybody who expresses an opinion that we as human beings don't necessarily agree with. The fact is, though, is this didn't do anything to cause a severe disruption within the library's  So as to your trigger on the heart of the problem when we're doing this Pickering balancing, where do we draw the line as to what is harmful and disruptive to the employer? And it seems to me we have to draw the line before we figure out whether this speech falls on one side or the other of the line. So within the context of employee dissatisfaction, there could be either a measurable loss of morale, which would be probably far more objective. But if the employees, this isn't speech that occurred here, but if the speech was so reprehensible, so disgusting, that the employees were to get together and in a concerted action, threaten to tender resignations, that's certainly beyond the mere disharmony of a workplace. Suddenly you're going to be down almost all of your work staff. The employer interest may be better served in that case. But here, nobody threatened that. In fact, some of the employees said that they understood what he was saying. Again, they didn't like it, but they understood his underlying message, which was he doesn't give a care about these protests. So what would you have a say and an opinion about how a court should determine what passes muster and what doesn't pass muster under Pickering? I think the court should first say that what underpins the employer interest is a desire to remain neutral. And that when an employer actually speaks on the issue at hand, it cannot then turn around and punish an employee for having spoken and taken an opposite position on that issue. It really does upset the employer's purported interest, because nobody was asking the library whether it stood in solidarity with the protesters at the time that they made their position on Facebook. Similarly, nobody was asking Mr. Noble about his position on that either. From there. So I'm missing that. You look to see if the employer has taken a position and then can't punish somebody from taking the contrary position. But where do we find the library having taken a position in this case? The library took a position in two instances, Your Honor. On the same day that it suspended Mr. Noble, it changed its Facebook profile picture to the all black profile. And when a patron or somebody on Facebook asked the library, what is this about? The library explained that it did it to stand in solidarity with the countless lives that have been lost to police violence and against the systems of oppression that make it so. I think I'm paraphrasing a little bit. And then the other was a public letter from the director of the library, which was posted on the library's website, where among other things, it expressed that it understood that there is a call for change in the community and a discussion of renewing and refreshing Cincinnati's collaborative agreement. And then it also featured several tags for black liberation, Black Lives Matter, racial justice, racism, police brutality, systemic violence, and white supremacy therein. So I think in this case, the library did take a position, Your Honors. I see I'm out of time, and I'd like to reserve the rest of my time for rebuttal. OK. Thank you very much.  Your Honors, may it please the court, good morning. I'm Felix Gora, and I represent the library, its board, and the executive director, and also the HR director who were included as defendants in the case. I want to answer a couple of the court's questions first. The question came up, is this a matter of law or not? Is this a question that needs to go to a jury? The cases say where the facts are basically undisputed, and I think the facts are undisputed in this case. It's a matter of law for the court. The court decides. If there are some factual disputes, then I think that's when the jury gets involved to rule on those facts, and then apply them to the law. But in this case, the facts are clear, and the facts clearly show that the efficiency of the library is disrupted by the meme in question, and that's Judge Baird's decision. How do we determine that? I mean, we can take you as you were in the library's work, but I understand that. My understanding is the library had somewhere grand total around 800 employees. Correct. Looks to me like five or six employees said they were troubled by this post, either because they affirmatively came forward and said that, or they got called by the HR director doing her investigation, and they hadn't said anything until she called them, and they said, yeah, they were troubled by that. So I'm not asking you to set a numerical test or anything like that, but it seems like very few in the bigger scheme of things people were complaining about this. First of all, the meme on the Facebook page lists Mr. Noble as a security guard for the library. So that's directly affiliated with the meme. The meme says, and shows a stick figure in a car running over people. The head of the security department at the library, Wei Liu, and his testimony is in the record, and he's been trained in police, his undergraduate degrees, and he said, that's murder. That's murder. So the first thing the library receives is an email from an employee. It's in the record, Ms. Mumford. What does that email say? Someone in charge of staff and public safety posted something so obscene it's upsetting. I had multiple staff send me the screenshot. Staff confidence and comfort in this person protecting us and our customers is low. Staff are feeling scared, exposed, and wary of those in charge, quote unquote. What happens next? The library gets it. Does it just say, OK, you're fired? No, it conducts an investigation. What does it do? It talks to the employees. The employees come in. They're cited in the brief. Let me ask you a question. Let's say what had happened is Noble had, let's reverse the order of things. The library takes a position in support of the protesters. Noble goes on Facebook and says, I think this is crazy. I think what they're doing is lawless. They're breaking windows, and I'm ashamed that my employer is supporting this. Would we all agree that pickering balancing would lead to the library not having authority to fire him for that? Assuming those facts to say, well, I think there needs to be more social. I would say yes. Right, so this all comes down to the tastelessness part of it, right? It deals with the car running over people of a person who is in public safety. What's tricky about it, or at least I'm trying to figure out what to do with it, is what if it really was just a mistake in the sense of it really is just a very bad joke? It's just the worst form of humor. But reality, it was humor. It wasn't meant to be hateful. He didn't want murder. He didn't want people being run over. He just saw this stupid picture for more than two seconds, thinks it's funny, and therefore makes the tragic mistake of reposting it. What do you do with that? I'm not saying that's this record, but I can't imagine worlds in which you have people just with terrible sense of humor, and they just make a mistake. How does that enter into pickering balancing? The first thing is to determine whether it's constitutionally protected. Is it constitutionally protected speech? And frankly, Judge Baird didn't rule on that. He went second to the pickering argument. He assumed that this was constitutionally protected speech. I'm trying to ask you, what happens when it's a mistake? And it's not about murder. There's no, in fact, the employee comes up and just apologized and said, I can't believe I did this. My first reaction, stupidly, was to think it was funny. I'm ashamed that that's what I thought. But that is what I thought, albeit for two seconds. But it was two seconds too long. What do we do with that? You still have to look at the pickering test and say it's not just what the employee thought. He said it was just funny over and over and over again. It's not funny. It's not funny to the people it impacted and who saw it. That's the result. So in your world, under pickering balancing, the library would still have an interest, even though it really was a mistake. And he admitted it and said, I'm sorry that for two seconds in my life I thought this was funny. I realize it wasn't. Exactly. It's like the employment. They'll have a right to fire him. Absolutely. It's like in the employment arena, hey, I made a mistake stealing that money. Hey, I made a mistake when I did this. I mean, the same kind of thing. You're going to lose credibility if you go too far with your hypotheticals. Do what you want. And look at the pickering test. Let me ask you this. So you're saying the subjective intent of the employee is not relevant to pickering analysis? It is not. And in fact, it's the same argument that. But you are saying the subjective intent of the people, the other employees, is relevant. Because that's what pickering says. Pickering says in its tests, the impaired discipline by. Is there any objective test involved? Or is it all just a matter of the employer? Doesn't it have to be a reasonable observer? I'm sorry? Doesn't it have to be a reasonable observer? It's not just whatever anyone thought. It has to be a reasonable reaction. It has to be a reasonable reaction. And in line with what the elements are of pickering, to analyze on a factual basis of each case what is in question, what was the speech? And then, what does an impaired discipline by superiors or harmony amongst the co-workers? In this case, it clearly did. We've cited the testimony of the people. And I take it there's no evidence here that anyone outside the library saw it. In this record, no. But I would also refer you to the termination letter. Because in the Markhart case, we did have that community awareness of the social media post. We don't seem to have that here. It's all just internal knowledge of the post, correct? But I would refer to the testimony of the people who were interviewed would say, this impacts the community. This impacts me dealing with those who, this is racial. How am I going to deal with the people? As long as no one inside the library tells the rest of the world about it, there's not a problem outside of the rest of the world, is there? It's just within the library itself. Well, we don't know who else saw that. We didn't go out and canvas everyone. Well, there's no evidence of anyone. You said there were no fact disputes here. I'm sorry? You said there were no fact disputes here. So we're going to assume no one knew anything about outside the library. There is no fact in the record that shows that someone outside or anyone complained outside. But there are complaints made. And the individuals in the library indicated the impact it would have on them. And they're dealing with the public and their customers, the people who go in and out of it. So in that sense, yes, there is an impact. What would happen hypothetically if one person had seen this reposting, called the guy, said, I think this is terrible. You shouldn't do this. He takes it down. And then they go back and tell their boss what they saw. So we have one person that actually saw this and was offended by it. Would the library, under that hypothetical, be justified in firing this guy? Your Honor, that's a difficult hypothetical in terms of one person. That's why I asked. Yeah. I would think if that one person had. You have to agree they couldn't fire in that situation. Probably not. But this is much more egregious than that. So here at 6. So again, I'm not asking you to draw a concrete line or suggest where we should draw the line. But it just doesn't seem. I'm not defending this in any way. But it seemed like a fairly small, insular group of people that were talking among themselves, who were supportive of the protest. So they were inherently unhappy with somebody that takes a contrary position. And they got the guy fired. You've got to throw in that this individual drives vehicles for the library. And I'm the employer. And if this person drives vehicles and he has that figure out, and I know he did that and he was thinking that. So you think it's reasonable for the library to have assumed, because of his animus, that he would take a library car and he would go out and intentionally mow down protesters, arguably as happened in, what was that, South Carolina or wherever that was? You think that's a reasonable interpretation of the library staff of that meme? I don't think we can take a risk, Your Honor. We can't. In fact, the case law is cited by the trial judge that says we don't have to wait for something bad to happen. We don't. I just really want to clarify this point. You think that's what explains the Pickering balancing, that it was reasonable for them to be afraid that this meme showed he was going to take government property and drive over people? I think that's what you're saying. What I'm saying is we don't know what's going to happen. We do know that the co-employees who were interviewed. You've got to answer the question. You know the question I'm asking. Is this one of the government interests for firing him? That this meme showed there was a material risk that he was going to drive over people? In and of itself, I wouldn't say so. But you're either putting it on the balance or you're not, right? That's what this is. I think. Are you going to put it on or not? I think we have to. If something, we can't predict the future. If something bad happens, and this did happen, pray God that it never would, we would be responsible because we would be on notice. We would. And you thought the investigation showed that this person, there was a material risk. The word material is the key point. You think after the investigation, there was a material risk that Noble was going to drive over people? I think as a factor in the analysis about whether or not we had a reasonable ground to dismiss him. And in addition, in Bennett, we have to look at. Let's pursue this reasonable suspicion for just a second. There was also the sense that some of the employees thought that he would not have been effective in dealing with disturbances in a section of the library that I think was called Teen Town or something like that. And the record seems to suggest that there were a number of minority library users in that section. So again, sort of asking you the same question. Is it reasonable for the library to assume? Because this guy posts this tasteless, offensive meme about the protests that therefore he's going to display racial animus when he deals with minorities in this Teen Town section of the library. Your Honor, we've cited the testimony of those people. And there questions his ability in the way he treats people going forward. I had a negative reaction. This was about police brutality, and he's in the position of public safety here, of hard time talking if they asked about it. He's a public safety officer, and it's the polar opposite of how she views things, disturbed by it. We've read all that. We're trying to figure out whether that's a reasonable interpretation by, in this case, employees of the library who are clearly mad at this guy because he was on the other side of the protests. Correct. And I want to add in addition, under Bennett. Correct is not the answer. What's the answer to the question? Is it reasonable to assume that he's going to abuse black kids because of this meme? I think under the tests that are being applied, does it interfere with his ability? The test that we're looking at is not whether he's going to abuse kids. There's a fear that he's going to treat blacks differently. But when we're doing the Pickering balancing, you would agree, would you not, that we have to look to see if the determination of the factors on both sides are reasonable conclusions drawn by the employer. They are reasonable. They have to be in good faith, not pretext. Do they have to be in good faith? Do they have to be reasonable? Do they have to be both? The law says they have to be in good faith. Which person thought he was going to go run over people? Did someone say that? There is nothing specific in the decision to fire him that says that we're going to run over people. But the state figure it. But just please, just answer the question I'm asking. It's going to make life a lot easier for you. Is there evidence where someone said, I think we've got to let him go because I'm afraid he's going to use government property to run over people? Did that happen? Did someone say that? I don't believe that's, no. OK, so in a case in which there are no disputed facts, as you said at the beginning, that shouldn't be part of our inquiry, should it? The effect of the meme and what it depicts is what the insensitivity is. But aren't we supposed to do pickering balancing based on what the government puts forward through evidence as what their concerns were? It is. But it has to be in good faith under the pickering test, which says I got it, but why would I put something on the balance that wasn't mentioned by anybody? Do you understand why I'm asking this question? I do. OK, so why would that be part of it if that wasn't something someone said? Well, it goes to, is it insensitive? Does it cause concern? Does it impact the ability of the employees to get the efficiency of the organization for someone to make that kind of a meme, depicting that, working with other employees in terms of their relationships? And the answer is it does. Thank you very much. Good morning again, Your Honors. To answer, I think, a couple of questions that the court had, it's not reasonable to assume that just because of this post, Mr. Noble was going to abuse his authority with other groups that might have accessed the library. As much as, um. And I take it there's nothing else on the record against this employee to justify the firing other than the meme? Correct, Your Honor. The meme was the only reason listed in his termination paperwork. And throughout discovery and on deposition, everybody from the library was in agreement. Before this meme, he was a great employee, absolutely stellar. And I think that that really does factor into whether or not it was reasonable for the library, in this case, to assume that he would abuse his authority. He hadn't had any instances of doing it before. Weilu was asked specifically in deposition, you know, did you ever have to flag any ejections by Mr. Noble? What was the evidence of how the employee, Mr. Noble, responded whenever he was confronted with the meme? What was his answer to that? I believe Mr. Noble's. Did he say it was a mistake? He said he thought. Did he apologize? What did he do? He said he posted it because he thought it was funny. He thought it was funny. And it's a cartoon. I can see how he thought it was funny. Didn't he go further in explanation in his deposition? He did go further in explanation in his deposition. The only contemporaneous records of Mr. Noble in his termination meeting or in the meeting where he found out he was being suspended was recorded by the public library. Mr. Noble did not keep contemporaneous notes of that. But in his deposition, he explained that he was trying to convey what he thought about the protests, that he thought that once things got violent, it wasn't really a protest anymore. And was there anything about his response that would suggest instability or any vendetta against another employee? No, no, Your Honor. Actually, during his, I believe it was in agreement with Mr. Liu's deposition. But in Mr. Noble's suspension meeting, he was told that some employees were complaining because they were at the protest. And Mr. Noble stood there and expressed his agreement with them being able to express their opinion. He maintained that's their right under the First Amendment. And I think that's really what makes this case tragic for him. As Mr. Noble clearly believed in that right to express opinions, he didn't have any sort of outward animus towards his colleagues, towards his co-workers. But because he distastefully expressed an opinion, he lost his job for it. Would you agree that at least arguably part of his problem was he didn't express himself very well when he was confronted by the library staff? I would agree with that, Your Honor. But I don't think that the court, I think it would be a mistake for us to impose a ward count or require a baseline of eloquence when weighing Pickering analysis. Not every individual is able to stand up here and argue a position. By the same token, one might say that the First Amendment allows employers to make mistakes. In other words, I might call this a mistake. The library could have handled this better. But I'm not sure the First Amendment bars mistakes. This one's a close call, and I'm a little embarrassed about how they handled it. But that just means it's a mistake, like his mistake. It may be a close call, Your Honor, but the Constitution needs to tip in the balance of the employee and the citizen. That's precisely my point. And I'm not sure the First Amendment bars mistakes. I'm not inclined to think they did this just because they were trying to suppress the speech. I think the main reason they did it is they didn't want to deal with the fact that it was tasteless, and they just didn't want to deal with it. Rather than doing the hard work of getting people together and trying to get him to apologize and explain the mistake he'd made, I just thought the easier solution here is just to fire him. And I'll call that a mistake, but I'm just not sure the First Amendment regulates every mistake by a government employer. I see I'm out of time, Your Honor, if I can respond briefly. I can understand that perspective, but here it's because of the speech. And whether it was a mistake by the government, they went on an investigation. The investigation found no evidence of disruption. The investigation found nothing to implicate Mr. Noble's job duties, and they still chose to fire him. I understand the human concern of having to look at these employees who have raised a concern and say, look, you're going to have to deal with it, but that's part and parcel of being an employer. Sometimes you have to make those hard decisions. These employees were out exercising their free speech rights. Mr. Noble had the right to do the same. In Claremont County, there was a protest, a Black Lives Matter protest, and the community there rather conservatively came out expecting violence. They toted guns. I don't think that if the role was reversed or if the situation was different and Mr. Noble was at that protest marching in support of black lives and went into the library, which happened to have more of a conservative skew, and the library said, hey, we don't like that you're endorsing violence, and we don't want to have to try and do the hard work of explaining to them, to our co-workers of this, that it would just be a mistake. I think at that point, the First Amendment becomes illusory,  All right, well, thanks for your helpful arguments, both of you, and your briefs. We appreciate it. The case will be submitted.